## RACKOFF v. UNITED STATES.
### No. 447.

Circuit Court of Appeals, Second Circuit.
July 15, 1935.

Thomas H. Greene, of New York City, for appellant.

Martin Conboy, U. S. Atty., of New York City (Thomas McCall, Asst. U. S. Atty., of New York City, of counsel), for appellee.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This action was brought on March 22, 1932, to recover upon a policy of war risk insurance. The complaint alleged that Jacob Dancer, while serving in the United States Army, suffered a severe injury to his head from the explosion of a shell, which was aggravated by the severe emotional strains experienced on the battlefields of France, and resulted in his permanent and total disability while the policy was in force. The jury returned a verdict for the United States on which a judgment was entered, and from it the plaintiff has appealed. The errors relied on by the appellant are in certain rulings made by the trial judge.

Jacob Dancer enlisted in the regular army of the United States on June 19, 1913, served overseas from May 27, 1918, to September 7, 1919, and was honorably discharged June 18, 1920. While in the

**672**

service he obtained war risk insurance against total permanent disability.

■ An amendment of the answer was allowed to the effect that the policy lapsed for nonpayment of the premium due October 1, 1919. The plaintiff had introduced in evidence a letter from the Veterans' Administration to him (Exhibit 2) which rejected his claim and stated that the insurance lapsed for nonpayment of premium on that date. In spite of an allegation in the complaint that Dancer kept up his premiums until his discharge from military service on June 18, 1920, which was admitted by the original answer, the insured evidently failed to pay his premium on October 1, 1919, and the case seems to have been tried on that theory. The plaintiff had the burden of proving that any later premiums were paid and offered no such evidence. Accordingly the real date when the policy lapsed was on October 31, when the days of grace afforded by the War Risk Insurance Act expired. United States **v.** Phillips (C. C. A.) 44 F.(2d) 689.

■ Dancer was attached to a field artillery battery of the Fifth Division. Plaintiff introduced evidence that during a bombardment at Vilcey, France, on November 9, 1918, he and several other soldiers, including his particular pal Wagoner, took refuge in a stone hut where a three-inch shell exploded killing six of the men and mortally wounding Wagoner, who died two days later. Dancer himself was thrown on his face by the concussion. When he revived he found Wagoner's right arm around his neck, his left hand shot off at the wrist, and a hole through the latter's back as big as a silver dollar. The testimony of Dr. Savitsky, a neurologist called by the plaintiff, was to the effect that the explosion of the shell damaged the tissues of Dancer's brain and gave rise to a condition known by neurologists as post-traumatic constitution. There was testimony that, as a result of this, he lost self-control, could not eat or sleep, suffered from dizziness, and acted in an irrational and irresponsible manner. He returned from France in September, 1919. His family testified that on his return that month he was restless, could not sleep, would throw up his hands and cry "over the top," would march up and down with a broom which he would point at some object and yell "there goes another Boche," and that his appearance, which had been neat before, was sloppy. One of them said that in Oc-

tober, 1919, on a Rockaway Beach train at the sound of the whistle he jumped off his seat, laid down on the floor of the car, and began screaming "over the top." On June 20, 1920, he married and on that very day said to his brother-in-law: "You know Alexander the Great went over the top. He did not get married." According to the witnesses for the plaintiff his eccentric behavior continued until he finally was committed to an insane asylum in 1927, and the plaintiff was appointed committee of his property.

There was testimony that between the time of Dancer's return from the army in June, 1920, and his commitment he was excitable, quarrelsome, and on various occasions threw dishes about the kitchen, molested young women, and beat his wife; that he worked for only short periods and in some twenty different places.

Some five or six months after the bombardment on November 9, 1918, he contracted a venereal infection which seven years later resulted in paresis, but the plaintiff's neurological expert attributed his lack of self-control and general "conduct disorder" to brain lesions caused by the explosion, and not to the infection.

Most of the plaintiff's evidence as to Dancer's irregular and scanty work record was from members of his family. The government laid stress on the fact that he was not totally and permanently disabled, because at times he worked for high wages and in one of the places where he thus worked lost employment only because he engaged in labor agitation; that, when examined for his discharge, he stated that he was not suffering from the effects of any wound, injury, or disease and had no disability; that he applied for life insurance on May 19, 1921, and on May 19, 1922, and in each application represented that he was in good health and free from disease. Likewise the medical examiners of the insurance companies certified that he showed no evidence of disease of the brain or nervous system.

Upon the foregoing record it was a question for the jury whether Dancer became totally and permanently disabled before his policy lapsed. They answered the question in the negative and returned a verdict on behalf of the defendant.

■ The supposed error of the trial judge on which the plaintiff has laid most stress was the exclusion of ques-

tions propounded to Dr. Savitsky as to whether under the circumstances in this case Dancer would be able continuously to follow a gainful occupation. These questions were ruled out "on the ground that they were to be determined by the jury, and not by the doctor." In so doing, the judge added: "You can bring out his medical condition or otherwise, as of any date you want * * *." It is argued most earnestly that these rulings prevented the plaintiff from properly developing his case and furnishing to the jury an adequate basis as to the degree and the permanence of the mental impairment of the insured prior to the time when the policy lapsed. We are not impressed by this contention. Indeed the Supreme Court recently criticized the admission of testimony by experts in which they were allowed to give their opinions that the insured became totally and permanently disabled before the policy lapsed, United States v. Spaulding, 293 U. S. 498, 506, 55 S. Ct. 273, 277, 79 L. Ed. 617, remarking that the "question is not to be resolved by opinion evidence. It was the ultimate issue to be decided by the jury upon all the evidence in obedience to the judge's instructions as to the meaning of the crucial phrase and other questions of law." But questions to experts are not always objectionable because the answers would be answers to the ultimate question to be decided by the jury, and we have no idea that the Supreme Court intended to lay down such an invariable rule. In some cases, where, for example, the sanity of a person is the ultimate issue, an expert should be able to give his opinion as to that very matter, because as Judge Sibley says in a characteristically illuminating opinion the issue "cannot be further simplified and cannot be fully tried without hearing opinions from those in better position to form them than the jury can be placed in." Hamilton v. United States, 73 F.(2d) 357, 359 (C. C. A. 5). See, also, Wigmore on Evidence (2d Ed.) § 1920. Ordinarily, however, questions involving substantially the whole issue should not be allowed because the conclusion involves matters that are neither necessary nor proper for the consideration of experts and embodies situations which have not been adequately analyzed and factors which have not been sufficiently developed.

Whether Dancer could continuously follow a gainful occupation was not a question for an expert. Upon the assumption, he was quarrelsome and at times irrational, subject to painful headaches, dizziness, and fits of violence; whether such a man could get or retain a position, a jury could as readily determine as an expert, once his inevitable behavior was known. The expert might be asked whether work would injure his health, whether his malady was incurable, and any other questions peculiarly within his scientific knowledge. We do not see that the trial court interfered with inquiries that were within this legitimate field. We think Judge Sibley had the right approach to the whole problem when he said in Hamilton v. United States (C. C. A.) 73 F.(2d) 357, 358: "The true rule is that admissibility depends on the nature of the issue and the circumstances of the case, there being a large element of judicial discretion involved." Judge Coxe did not exceed his discretion when he excluded the questions we have referred to.

It is further objected by the plaintiff that the judge erroneously described the injuries as due to "shell-shock" rather than to the shaking up of the brain tissues, and spoke of Dancer as "not in any way physically injured at the time" of the explosion. No exception was taken to the charge on this ground. We have little doubt that Judge Coxe was doing no more than distinguishing between external and internal injuries, and cannot see that any prejudice resulted from this unchallenged statement in the charge.

The criticism of the exclusion of questions to the lay witnesses seems without foundation. The questions related either to matters of hearsay or to matters having only a remote relation to the case, and the rulings we think were within the discretion of the trial judge.

The case was submitted to the jury on the theory that the policy lapsed on October 1. This did not take into account the days of grace allowed by the statute. Inasmuch, however, as plaintiff's case was founded on injuries alleged to have been sustained by the explosion on November 9, 1918, we think that any difference between October 1 and October 31 in fixing the date of the lapse of the policy could not be prejudicial. This is particularly so when the plaintiff tried his case and introduced his evidence upon the theory that October 1 was the date of lapse, and the judge submitted the case to the jury on that theory.

Judgment affirmed.