## MUTUAL LIFE INS. CO. OF NEW YORK v. FROST et al.

### No. 4278.

Circuit Court of Appeals, First Circuit.

Nov. 26, 1947.

S. Everett Wilkins, Jr., of Providence, R. I. (Edward M. Watson, of Providence, R. I., Louis W. Dawson, of New York City, and Hinckley, Allen, Tillinghast & Wheeler, of Providence, R. I., of counsel), for appellant.

Henry M. Boss, of Providence, R. I. (Martin M. Zucker, of Providence, R. I., of counsel), for appellees.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

MAGRUDER, Circuit Judge.

The complaint here sought recovery of disability benefits alleged to be payable to the insured, Morton F. Frost, under the terms of four life insurance policies issued by the defendant company. Suit was brought in the United States District Court for the District of Rhode Island. Joined as coplaintiffs with the insured, who sued by his conservator, were the two beneficiaries named in the policies. They are all citizens of Rhode Island, and defendant is a New York corporation. More than $3000 is involved, exclusive of interest and costs. The trial judge, sitting without a jury, gave judgment for the plaintiff, from which the insurance company appeals.

The first policy, in the face amount of $5000, was issued in 1924, and provisions for disability benefits were added by rider in January, 1930. The other three policies, for $10,000 each, were issued in 1929 and 1930, and also contained provisions for disability benefits and waiver of premiums. Since the disability provisions in the four policies were in substantially identical terms, except for the amounts payable, it is sufficient to quote only from the rider to the 1924 policy as follows:

"If the Insured * * * is totally and presumably permanently disabled before age 60, the Company will pay to said Insured

"A monthly income of fifty dollars during such disability, increasing after five and ten years continuous disability,[1] besides waiving premium payments under said Policy, all in accordance with the following provisions and conditions.

"Total Disability: Disability shall be considered total when there is any impairment of mind or body which continuously renders it impossible for said Insured to follow a gainful occupation.

"Permanent Disability: Total disability shall, during its continuance, be presumed to be permanent;

"(a) If such disability is the result of conditions which render it reasonably certain that such disability will continue during the remaining lifetime of said Insured; or,

"(b) If such disability has existed continuously for ninety days."

Morton F. Frost was born in 1881. After graduation from a secondary school at the age of 20, he "stayed on his father's farm for ten years and ran the farm," according to his own testimony. Beginning in 1911 he attended Brown University for two years, taking special subjects for a pre-medical course. Then he spent a year at Tufts Medical School and two years at Harvard Medical School; but his work at both of these schools was unsatisfactory, and he completed his medical course at Middlesex in 1917. After a period of internship at three successive hospitals, he passed the examination of the Medical Licensing Board of Rhode Island and was licensed to practise medicine in that state in 1922, at the age of 41. For the next eleven years he practised in Providence, in obstetrics largely, and apparently quite successfully, at least from a monetary viewpoint.

Between 1930 and 1932 Dr. Frost got himself involved in a long succession of lawsuits with patients, in consequence of which he was exposed to a great deal of unpleasant notoriety and newspaper publicity on the theme of his alleged exorbitant fees. In these matters he displayed a woeful lack of good judgment and an utter inability to learn from past experiences. He lost most of his hospital connections. He broke down, and in a state of depression let his practice slide. After June 10, 1933, he ceased to practise medicine altogether, and since then has not engaged in any gainful occupation, though the evidence is that he has negotiated sporadic business transac-

[1] The rider provided, in a provision not set out above, that after sixty consecutive months of disability the payments should increase from $50 to $75 per month, and after a further period of sixty consecutive months of disability, the payments should be stepped up to $100 per month. Comparable provisions in each of the other three policies provided that payments should be increased from $100 to $150 a month, and finally to $200 a month, after the periods of disability above mentioned.

tions, such as buying a car, buying parcels of real estate, making a sale of lumber, doing the family shopping.

In October, 1933, the insured furnished to the company proofs of permanent and total disability rendering him unable to follow any occupation since June 10, 1933. The medical diagnosis was stated to be "psychoneurosis." Dr. Frost was examined by two physicians on behalf of the company; Dr. Huyler in 1933 and Dr. Casamajor in 1934, neither of whom was called as a witness by the company, a point which occasioned comment by the District Judge during the trial. The company accepted the claim, and, for a period commencing June 10, 1933, and continuing without interruption for ten years thereafter, paid disability benefits and waived premiums on the policies.

On August 6, 1940, Dr. Frost's wife was appointed as conservator of his estate by the Probate Court of the City of Cranston, Rhode Island.

The insurance company refused to make any disability payments, or to waive payment of premiums, after June 10, 1943, which was the date on which the disability payments would have been stepped up to the maximum as provided in the policies. Thereafter the payment of premiums on behalf of the insured was resumed under protest.

In discontinuing disability payments on June 10, 1943, it was not the company's position that the insured, on and after that date, had recovered from a total disability theretofore existing. This, indeed, would have been impossible to establish on the present record, because there was no evidence of a change for the better in Dr. Frost's condition as compared with what it was when disability payments began in 1933; the inference perhaps would be the other way, in view of the fact that a conservator for his estate had been appointed in 1940. Rather, the company stood, and stands, on the assertion that Dr. Frost never was totally and permanently disabled within the meaning of the policy, and that payment of disability benefits to him for ten years was all a mistake.

The District Judge found as follows:

"I find that the unfavorable newspaper publicity that Dr. Frost received as a result of the lawsuits in which he was involved and the loss of his hospital connection changed his personality from that of a dormant constitutional psychopath to that of an active constitutional psychopath.

"I find that on June 10, 1943, Dr. Frost was totally disabled within the meaning of the policy contracts.

"I find that Dr. Frost became totally and permanently disabled before age 60 by reason of impairment of his mind which continuously renders it impossible for him to follow a gainful occupation."

It is the main contention of appellant that the above findings were "clearly erroneous" in that (1) evidence was wholly lacking to support a finding that Dr. Frost "had suffered an impairment of the mind," and (2) there was no evidence that Dr. Frost "now is or ever has been unable to follow some [gainful] occupation other than the practice of medicine."

We think the evidence amply sustained the trial judge's findings and conclusions.

Two expert witnesses testified on behalf of the insured, Dr. Daley and Dr. Carroll. They agreed pretty well in their diagnosis; and indeed they were in essential points corroborated by the testimony of the defendant's one expert witness, Dr. Chesher.

Dr. Daley, a specialist in mental and nervous diseases, testified that he first examined Dr. Frost in 1933 and his diagnosis was "constitutional psychopathic inferiority with reactional depression"; that he formed the opinion that Dr. Frost was unable to practise medicine because of his condition; that he saw him seven or eight times between 1933 and 1936; that he examined Dr. Frost again in June, 1946, and found him about the same then as he had been since 1933. He further expressed the opinion that Dr. Frost "had always had a constitutional psychopathic personality"; that due to his "inferior mental makeup and personality" he was unable to cope with the hostile environment created by his own blunders, blunders attributable to the lack

of judgment, inability to adjust to other people, and inability to learn from his own experiences, all of which are characteristics of a psychopath. The unfavorable publicity and loss of standing in the medical profession were "profound causes to a psychopathic person," adequate to cause the resulting depression and breakdown, and ensuing inability to practise medicine. In other words, as Dr. Daley said, what happened in 1933 was that Dr. Frost "developed a situational depression, and a psychopathic personality was released."

Dr. Carroll, also a specialist in nervous and mental diseases, testified that he first examined Dr. Frost in 1936, and that his diagnosis at that time was "constitutional psychopathic inferiority with depression and emotional instability." He described him as restless, fidgety, lacking in ambition, subject to crying spells and ideas of persecution. He stated that he had seen Dr. Frost several times a year since 1936; and that when he saw him last, in June, 1946, he thought that Dr. Frost was more emotionally unstable than in 1936; and "that in his present mental state he could not do any kind of work that would be suitable or equivalent to the practice of medicine and earn the money that he would earn in the practice of medicine." On cross-examination Dr. Carroll said that his diagnosis of "constitutional psychopathic inferiority with depression and emotional instability" was equivalent to "constitutional psychopathic personality"; that the word "constitutional" meant that he had always had this condition; that the word "psychopathic" referred to his mind;[2] that the word "personality" referred to the patient's makeup and behavior. Dr. Carroll further said that in his opinion the insured all through his life had had a constitutional psychopathic personality; "that until 1933, he had a personality that he could get along with," and then "met with these adverse criticisms and as a result became depressed." The "psychic trauma" which he received at that time because of all the unfavorable publicity brought on the depression and a change in his personality. "I think of late he is worse and his paranoiac ideas are more so than they were at the beginning. In my opinion there was no malingering. * * * From my experience with this type of individual I felt that he was really ill."

Dr. Chesher, a specialist in neurology and psychiatry, produced as a witness by the defendant, stated that he examined Dr. Frost only once, on October 10, 1943; the interview lasted "not less than an hour, perhaps an hour and-a-half." His diagnosis was that Dr. Frost "was a constitutional psychopathic personality," a term used "to describe a constitutional defect in the personality makeup dating from birth and lasting throughout life." Dr. Chesher stated that in that examination he did not "find anything that indicated a true mental illness." Just what the witness meant by that is uncertain; on cross-examination he conceded that "psychosis is a functional mental disorder," and that the condition of constitutional psychopathic personality might lie "dormant" or unrecognized until something happens to manifest its existence.

■ At the trial the defendant explained to the judge its theory of the case as follows: Under the terms of the disability provisions, "there must be some change in the mind or body"—some impairment—occurring after the policies were issued; but here, as all the experts agreed, the mental impairment, that is, the "constitutional psychopathic inferiority," long antedated the issuance of the policies. To this it may be answered that if it were necessary to plaintiff's case, there was some evidence of a further deterioration of insured's mental condition after the policies were issued. In addition to that, no such proof is required. The contracts do not say that an impairment of mind must take place after

---

[2] In Webster's New International Dictionary, 2d ed., "psychopathy" is defined as "1. Mental disorder in general. 2. More commonly, mental disorder not amounting to insanity or taking the specific form of a psychoneurosis, but characterized by a defect of character or personality, eccentricity, emotional instability, inadequacy or perversity of conduct, undue conceit and suspiciousness, or lack of common sense, social feeling, self-control, truthfulness, energy, or persistence."

the insurance is procured. The company insured Dr. Frost in his then existing mental and physical condition, with all his latent frailties. Disability benefits attach if, thereafter, the insured becomes continuously disabled from following a gainful occupation due to an impairment of mind or body. It is no matter that the impairment of mind or body may have been pre-existing, if its effect in producing an occupational disability occurred after the policy was issued. When the policies were taken out, Dr. Frost was able to practise his profession. The medical evidence, above summarized, certainly warranted a finding that the "psychic trauma" suffered by Dr. Frost in 1933, due to the supervening hostile environment and unfavorable publicity reacting on his "inferior mental makeup"—his "constitutional psychopathic personality"—rendered it impossible for him to continue the practice of his profession.

As above stated, appellant's second objection to the trial judge's findings is that there was no evidence that Dr. Frost "now is or ever has been unable to follow some [gainful] occupation other than the practice of medicine." Dr. Frost himself testified, for what it might be worth, that since 1933 he "hasn't been able to practice or do anything because he has been depressed and people have been following him around." It is clear enough that it has become impossible for him to practise medicine. Dr. Carroll testified that in his present mental state Dr. Frost "could not do any kind of work that would be suitable or equivalent to the practice of medicine and earn the money that he would earn in the practice of medicine." If the speculation might be indulged in that perhaps he could sell pencils at street corners or serve as a gateman at a railroad crossing, this would not preclude the recovery of disability benefits under the policies. In its brief, appellant has conceded that it is enough for the insured to show "that he is wholly prevented from performing in a reasonable and practical way all of the substantial duties in any work or occupation for gain or profit for which he is fitted or qualified by his education, training or experience, although he need not be absolutely helpless." It is suggested that Dr. Frost might take up farming again, because he worked on a farm in his youth. But there is nothing to show that at his age, with the deterioration of personality that he has suffered, the emotional instability, crying spells, depression, lack of ability to concentrate, and all the rest, he would be able to make a gainful occupation out of farming, let alone earn a livelihood in any way comparable to his former earnings in the profession for which he was trained.

The leading Rhode Island case on the meaning and effect of disability provisions of the sort here involved is Cole v. Metropolitan Life Ins. Co., 1934, 54 R.I. 88, 170 A. 74.[3] In that case the policy provided for disability benefits if the insured should, before age 60, "become totally and permanently disabled, as the result of bodily injury or disease occurring or originating after the issuance of said Policy, so as to be prevented thereby from engaging in any occupation and performing any work for compensation or profit * * *." The insured was stricken with infantile paralysis which caused permanent paralysis in the lower half of his body. At the time he was stricken he was employed as a foreman on construction work. Afterwards he put up a sign at his father's place of business announcing himself as an architect and engineer, and in eight years he earned about $350 by drawing plans and estimates. The court held that the insured was "totally and permanently disabled" within the meaning of the policy, applying the familiar rule that "in cases of doubt, the provision for total disability in the policy should be liberally and fairly construed in favor of the insured." Further, the court said:

"The term 'totally and permanently disabled' is not to be construed literally. Pannone v. John Hancock [Mut.] Life Ins. Co., 52 R.I. 95, 157 A. 876. It is generally held that the term is relative. Its interpretation as employed in a contract of this character depends in part upon the occupa-

---

[3] No question of conflict of laws has been suggested. The parties and the trial judge have all assumed that the interpretation of the contracts is determined by the Rhode Island law.

tion and the capabilities of the insured and also upon the circumstances of the particular case. Clarke v. Travelers' Ins. Co., 94 Vt. 383, 111 A. 449. Couch on Insurance, § 1670. Regard also must be had to the object and purpose of the contract which is to indemnify the insured for loss of time by reason of his incapacity to perform his usual work or to carry on his usual business by reason of the happening of the event covered by the policy. It would defeat the purpose of the contract to hold that the insured must be completely helpless to be entitled to the benefits of the same. If he is unable. to perform the substantial and necessary acts in the prosecution of his work or business, he is entitled to the benefits of his contract, unless it appears that he is able to engage in some other gainful activity. The fact that he has been able to earn trifling amounts as a draftsman and estimator does not effect (sic) his right of recovery when he might reasonably have refrained from making any effort at remunerative employment. American Liability Co. v. Bowman, 65 Ind.App. 109, 114 N.E. 992; Couch on Insurance, § 1673."

■ The point to be emphasized in the above quotation is that the insured makes out a prima facie case when he establishes his inability to carry on his usual occupation, "unless it appears that he is able to engage in some other gainful activity." The insured, in other words, does not have to establish a universal negative by offering proof of his inability to pursue any gainful occupation which might be imagined.

■ In further support of the District Court's findings and conclusions in their entirety is the fact that, when the insured made his claim for disability payments in 1933, the company, after investigation, and examination of the insured by two doctors. on the company's behalf, approved the claim, and thereafter made monthly disability payments for ten years without interruption. This evidence was properly allowed in as an admission by the company that the insured had become totally and permanently disabled within the meaning of the policies, and the trier of the facts was entitled to give it due weight in connection with the other evidence in the case. See Travelers Ins. Co. v. Drake, 9 Cir., 1937, 89 F.2d 47, 49; Prudential Ins. Co. v. Battershill, 5 Cir., 1946, 154 F.2d 947, 949. Of course, this evidence was not conclusive against the company, as an estoppel, or otherwise, but the trial judge did not so treat it.

■ As a final point, appellant urges that the District Court erred in excluding a proffered negative answer by Dr. Chesher to the following question: "In your opinion, Doctor, based upon your examination and the history that he gave you, has Doctor Frost, since he took out the policies in question in 1929 and 1930, sustained any impairment of mind?" Appellees answer that the question was improper because it called for an opinion upon the ultimate issue in the case and thus usurped the function of the trier of the facts. An exclusionary rule to this effect, as laid down in some court decisions, has been vigorously criticized. See Wigmore on Evidence, 3d Ed., §§ 1920-1922, 1975. Obviously such opinion evidence, if admitted, does not usurp the function of the trier of the facts. It would not be conclusive, but only evidence, which the jury, or judge sitting without a jury, might credit or not, as seemed warranted upon a consideration of all the evidence. We go along with the statement by Judge Sibley in Hamilton v. United States, 5 Cir., 1934, 73 F.2d 357, 358, as follows:

"Some have thought an opinion on the ultimate issue to be wholly inadmissible. * * * Others have denied that that ought to have an effect on the question of admitting the opinion. * * * We think the true rule is that admissibility depends on the nature of the issue and the circumstances of the case, there being a large element of judicial discretion involved. * * * Oftentimes an opinion may be received on a simple ultimate issue, even when it is the sole one, as for example where the issue is the value of an article, or the sanity of a person; because it cannot be further simplified and cannot be fully tried without hearing opinions from those in better position to form them than the jury can be placed in."

An expert opinion on whether the insured was "totally and permanently disabled" within the meaning of the policy is objectionable, as was held in United States v. Spaulding, 1935, 293 U.S. 498, 506, 55 S.Ct. 273, 277, 79 L.Ed. 617. The reason is that such a question entangles factual matters as to which an expert opinion is appropriate with questions of law involving the interpretation of a clause in the policy, as was explained in Hamilton v. United States, supra, and in Rackoff v. United States, 2 Cir., 1935, 78 F.2d 671. In the latter case the court, recognizing the authority of the Spaulding case, added 78 F.2d at page 673: "But questions to experts are not always objectionable because the answers would be answers to the ultimate question to be decided by the jury, and we have no idea that the Supreme Court intended to lay down such an invariable rule." Indeed, the rationale of the matter as explained by Judge Sibley has been recognized by the Supreme Court as far back as Transportation Line v. Hope, 1877, 95 U.S. 297, 298, 24 L.Ed. 477, where the court said:

"The witness was an expert, and was called and testified as such. His knowledge and experience fairly entitled him to that position. It is permitted to ask questions of a witness of this class which cannot be put to ordinary witnesses. It is not an objection, as is assumed, that he was asked a question involving the point to be decided by the jury. As an expert, he could properly aid the jury by such evidence, although it would not be competent to be given by an ordinary witness. It is upon subjects on which the jury are not as well able to judge for themselves as is the witness that an expert as such is expected to testify. Evidence of this character is often given upon subjects requiring medical knowledge and science, but it is by no means limited to that class of cases. It is competent upon the question of the value of land, Clark v. Baird, 9 N.Y. 183; Bearss v. Copley, 10 N.Y. 93; or as to the value of a particular breed of horses, Harris v. Panama Railroad Co., 36 N.Y.Super. 373; or upon the value of the professional services of a lawyer, Jackson v. New York Central Railroad Co., 2 Thomp. & C. (N.

Y.) 653; or on the question of negligence in moving a vessel, Moore v. Westervelt, 9 Bosw. (N.Y.) 558; or on the necessity of a jettison, Price v. Hartshorn, 44 N.Y. 94, 4 Am.Rep. 645. In Walsh v. Washington Marine Insurance Co., 32 N.Y. 427, it was decided that the testimony of experienced navigators on questions involving nautical skill was admissible. The witness in that case was asked to what cause the loss of the vessel was attributable, which was the point to be decided by the jury."

█ In view of the foregoing it would certainly seem proper to ask a qualified specialist in mental disorders whether the insured had "sustained any impairment of mind." It is the sort of matter where the trier of the facts needs the aid of expert opinion; and further, it is not even the ultimate issue in the case, but only one of the subordinate issues of fact bearing upon the ultimate issue whether the insured had been "totally and presumably permanently disabled before age 60" within the meaning of the policies. If there were no more to it than this, we should feel constrained to hold that the trial judge committed reversible error in excluding the answer to the question. But appellees make the further point, which we believe to be well taken, that the exclusion of the evidence was at all events harmless and nonprejudicial. Earlier in the examination of Dr. Chesher, the trial court had sustained an objection to another question along similar lines, commenting "that this witness's answer, in view of the testimony he has given about what he was told in an hour or an hour and-a-half's examination would not be helpful to the court in that respect, what his opinion would be." That is, the trial judge, sitting without a jury, had already indicated that he would attach little or no weight to an opinion of Dr. Chesher on whether there had been a change in the insured's condition since 1929, in view of the fact that such opinion would necessarily be based upon a single examination of the insured, of an hour's duration, in 1943. It is clear, then, that if Dr. Chesher had been permitted to give his negative answer to the excluded question, it could not have affected the outcome of the case. In addition to that, the excluded evidence, which

would have been to the effect that there had been no "impairment of mind" arising since the policies were taken out, was based upon an erroneous theory of the case, as we have already pointed out, that under the policy contracts the insured, in order to make out a claim for disability benefits, had to show that the "impairment of mind" which rendered it impossible for the insured to follow a gainful occupation, arose after the policies were taken out.

The judgment of the District Court will be affirmed.