[Civ. No. 32687. First Dist., Div. One. Nov. 12, 1974.]

COUNTY OF MARIN, Plaintiff and Respondent, v.
ROBERT C. MARTIN, as Director, etc., et al.,
Defendants and Appellants;
COUNTY OF ALAMEDA, Intervener and Respondent.

**COUNSEL**

Evelle J. Younger, Attorney General, Elizabeth Palmer, Assistant Attorney General, and John J. Klee, Jr., Deputy Attorney General, for Defendants and Appellants.

Douglas J. Maloney, County Counsel, and Thomas G. Hendricks, Deputy County Counsel, for Plaintiff and Respondent.

Richard J. Moore, County Counsel, James E. Jefferis, Assistant County Counsel, and Jon A. Hudak, Deputy County Counsel, for Intervener and Respondent.

## OPINION

**ELKINGTON, J.**—Marin County and Alameda County, as plaintiff and intervener, respectively, in the action below sought among other things, a declaration of their rights "concerning claims for federal and state reimbursement for public assistance expenditures," as against the defendant Director of the State Department of Social Welfare (hereafter the "Department"). Deeming itself aggrieved, the Department has appealed from the judgment, and from an order denying a motion to vacate the judgment, which was thereafter entered.

California, like all or most of the states, participates in the federal categorical aid programs, created by the Social Security Act. (42 U.S.C. §§ 301-1396g, inclusive.) The programs are funded by the states and matching federal grants, and by county participation on the order of about 16 percent (at least in Marin County) of the amount locally disbursed.

The state's 58 counties, by statutory compulsion,[1] are agents[2] of the state in the administration of the public assistance programs. By Welfare and Institutions Code section 10600 (hereafter all statutory references, unless noted otherwise, will be to that code), the Department is "designated as the single state agency with full power to *supervise* every phase of the administration of the public social services." (Italics added.)[3] Section 10615

---

[1]Welfare and Institutions Code section 10800 states:

"[T]he administration of public social services in each of the several counties of the state is hereby declared to be a county function and responsibility and therefore rests upon the boards of supervisors in the respective counties pursuant to the applicable laws, and in the case of public social services for which federal or state funds are provided, subject to the regulations of the department.

"For the purpose of providing for and carrying out this function and responsibility, the board of supervisors of each county, or other agency as may be otherwise provided by county charter, shall establish a county department, unless otherwise provided by the county charter. Except as provided herein, the county department shall be the county agency for the administration of public social services and for the promotion of public understanding of the public social services provided under this code and the problems with which they deal."

[2]See *County of Alameda* v. *Janssen,* 16 Cal.2d 276, 284 [106 P.2d 11, 130 A.L.R. 1141]; *County of Contra Costa* v. *Social Welfare Board,* 199 Cal.App.2d 468, 473 [18 Cal.Rptr. 573].

[3]At the times concerned in the instant case section 10600 read as follows:

"It is hereby declared that provision for public social services in this code is a matter of statewide concern. The department is hereby designated as the single state agency with full power to supervise every phase of the administration of the public social services for which grants-in-aid are received from the United States government or made by the state in order to secure full compliance with the applicable provisions of state and federal laws."

The section has since been amended without substantial changes, at least as relevant here.

emphasizes the Department's duty to exercise a proper degree of state control over "county operations," even "tight supervision" if necessary, to the end that such county welfare administration shall be "economic, efficient, and effective."[4]

Eighteen of California's more heavily populated counties, which handle about 80 percent of the state's categorical aid caseload, operate their own welfare department merit systems. (Gov. Code, § 19802.) In their administration of the state's welfare programs the remaining 40 counties (including Marin County) must employ persons recruited by the Department and placed on lists which are certified to the counties. (Gov. Code, § 19800.) Uncontradicted evidence established that these persons would often "come in totally inexperienced in the welfare system at all and would be new hires off [sic]—in effect off the street except that they qualified by the examination." "Eligibility workers" determine one's eligibility for public relief and the amount of such aid. The majority of such workers were "newly hired"; in a recent fiscal year, of Marin County's 23 authorized "eligibility worker" positions, 21 of those positions "were [filled with such] new appointments." Only "[a] minority stay on," and there is "a fairly high degree of turnover." And "the length of time to train them to be able to function on the job is a matter of three to four months."

County welfare aid is administered under federal and state laws and regulations. The director of the Marin County Department of Social Services, in uncontroverted testimony stated: "Well, we have regulations on merit system rules and conditions for personnel and position classifications, have regulations on the training and development of staff, on the organization and structure of the department and relationships with some other departments, such as probation, the District Attorney. We have regulations governing the licensing of boarding homes for aged and boarding homes for children. There are regulations affecting or governing applications for aid, information and referral services and related record keeping, regula-

---

[4]The full text of section 10615 follows:

"California's 58 counties vary greatly in their welfare problems, and therefore they should not be treated alike in the supervision of welfare programs. The Legislature hereby declares its intent that the department examine the extent of state control needed over county operations, with a view toward eliminating excessive rigidity in procedure; the state should differentiate between those counties which need general direction as opposed to tight supervision.

"Within these guidelines, the department shall aid county departments in establishing economic, efficient, and effective methods of operation, including, but not limited to, advising and consulting with county departments with regard to the introduction of electronic computer and data processing systems, personnel utilization, office controls, centralized purchasing, centralized warehousing, writing of specifications, and examination of materials and equipment purchased by county departments."

tions on statistical reporting for Federal, State and local management needs, regulations on each categorical aid program and the MediCal program and food stamps, and in each of those areas the regulations go to eligibility conditions and standards, need standards, the application and treatment of income, grant amounts, forms, procedures and time limits, and there are regulations on complaints and fair hearings, and there are physical regulations and record keeping requirements. [¶] These go to payment and repayment of aid, the funding source distributions, administrative expense and reimbursement. [¶] I think that covers at least the major ones." The regulations, which "cover a substantial number of volumes" have "gotten more complicated" and are changed frequently. Those relating to "aid," and "eligibility [for aid]," constitute "probably the major portion of the changes." And the various regulations "sometimes conflict."

We set out some of the demands upon county "eligibility workers" by federal and state statutes and regulations. In determining eligibility for, and the amount of, public assistance they must act, not with deliberation, but "promptly" (Welf. & Inst. Code, § 10000; 42 U.S.C. § 602(a)(10); Department's Welfare Regulation, 40-101-18), and "promptly to eligible individuals without any delay attributable to the agency's administrative process" (45 C.F.R. [Code of Federal Regulations] § 206.10(a)(5)). They must be careful not "to elicit any information [from the applicant] not necessary to carry out the provisions of law applicable to the program" (Welf. & Inst. Code, § 10500). And they are insistently admonished that the pertinent statutes are to be "liberally construed" (Welf. & Inst. Code, § 11000; Department's Welfare Regulation, 40-101.14; *Haberman* v. *Finch,* 418 F.2d 664, 667 [7 A.L.R.Fed. 966]; *Stewart* v. *Cohen,* 309 F. Supp. 949, 956). Such a liberal construction under the Social Security Act has been held to mean: that "any doubts should be resolved in favor of coverage" (*Rasmussen* v. *Gardner,* 374 F.2d 589, 594); a construction "in favor of allowing benefits to a claimant" (*Brooks* v. *Gardner,* 276 F.Supp. 20, 23); a construction "loosely in favor of claimants" (*Millemon* v. *Secretary of Health, Ed. & Welf.,* 256 F.Supp. 938, 940); and that the act should be liberally construed "in favor of those seeking its benefits" (*Allison* v. *Celebrezze,* 238 F.Supp. 667, 673).

The complexity and ambiguity of federal, state and county welfare standards and regulations have received high judicial recognition. They were described in *Richardson* v. *Perales,* 402 U.S. 389, 399 [28 L.Ed.2d 842, 851, 91 S.Ct. 1420], as follows: "The system's administrative structure and procedures, with essential determinations numbering into the millions, are of a size and extent difficult to comprehend." And the Undersecretary of the Department of Health, Education and Welfare, which is charged with the federal share of the tripartite welfare administration, has described

the problem in this manner: "Many, if not most, of the problems your investigation will uncover are the direct result of a failing system with overwhelming structural weaknesses that cannot be solved under existing law." (Hearings before the Subcommittee on fiscal policy of the Joint Economic Commission (part 1), 92d Congress, 2d Sess. 67, 1972.)

It is recognized, at least on the federal level, that errors in determining eligibility for public assistance and the proper amount of such assistance, are inevitable. A regulation of the Department of Health, Education and Welfare calls upon each state agency to submit: "A schedule for reducing the level of payments to ineligible recipients and of overpayments for eligible recipients to achieve, as of the 6-month period beginning January 1, 1975, a 3-percent-tolerance level on incorrect eligibility decisions and a 5-percent-tolerance level on overpayments to eligible recipients. . . ." (45 C.F.R. § 205.40(b)(4).)[5] A Department of Health, Education and Welfare manual, published and distributed to the participating states pursuant to another of such regulations, provides that "until the upper range of this *variation is exceeded [i.e., 3 percent and 5 percent] corrective action is not a requirement.*" It further asserts that: "Limits on rates of error are set at levels which are designed to protect the interests of the public and those served by the program, and at the same time take into account the inherent difficulties of keeping errors from arising in the complex process of administering the program." (See *Quality Control in Public Assistance*, U.S. Dept. of Health, Education and Welfare, Revised, June 1972 (SRS 72-21205, pp. IV 1, 2.)

We are brought more closely to the issues at hand.

The Department started a practice of auditing a small proportion of Marin and Alameda Counties' welfare cases, and then projecting the percentage of error found to the whole of each county's caseload. The sole object of the audits was county administrative error in determining welfare applicants' eligibility for public assistance, *and in determining the amount of such assistance.* In Alameda County, for instance, an audit of 91 cases, randomly selected from a caseload of 285,000, disclosed three errors representing improper or excessive welfare payments of $269.[6] The

---

[5]In the administration of its Social Security program of categorical aid, California is bound by related federal acts, and Department of Health, Education and Welfare regulations. (*Carleson* v. *Remillard,* 406 U.S. 598, 601 [32 L.Ed.2d 352, 355, 92 S.Ct. 1932]; *King* v. *Smith,* 392 U.S. 309, 316-317, 333, fn. 34 [20 L.Ed.2d 1118, 1125-1126, 1134, 88 S.Ct. 2128].)

[6]Although we are without assistance of the parties in relating these errors to the above-mentioned federal regulation (45 C.F.R. § 205.40(b)(4)), they appear to us to be within, or at least close to, the regulation's "tolerance limits."

state had of course already disbursed to the county, from its own and federal funds all, or nearly all, of that sum. The Department proposed to extrapolate the percentage of error found to the whole caseload, and thereby recover back from the county some $850,000. Similar auditing and recovery procedures were in effect, or planned, for all of the state's counties.

The litigation which gave rise to the instant appeals followed.

Following submission of the cause the trial court concluded from the substantially uncontested facts that: "Under applicable statutes [the Department's] right to adjust (cut) county claims for Federal and State reimbursement for public assistance expenditures by reason of administrative error, is limited to funds actually recovered by counties from a recipient, his estate or legally liable third parties." Judgment was entered so declaring and, among other things, enjoining the Department from continuing the intended procedure. It is that judgment from which the Department has appealed.

The criticial issue presented on the Department's appeal is whether, as a matter of law, California's counties must indemnify the Department for the percentage of state and federal contributions to welfare payments erroneously made, because of incorrect eligibility decisions and overpayments to eligible recipients.

We first consider the pertinent federal statutes, and regulations of the Department of Health, Education and Welfare which have the force and effect of statutes. (See fn. 5, *ante*.)

Nothing is found, nor has anything been pointed out to us, in the Social Security Act or its related statutes or regulations, holding *counties alone* to be financially responsible for the errors which seem to be inherent in public welfare administration.

We find the federal regulations relating to public welfare (45 C.F.R. §§ 201-280.12, inclusive) to distinguish carefully between "State and local [county] public assistance administration" (e.g., 45 C.F.R. § 201.10). It is the "state administration" which is responsible for the close supervision of the county agencies. The state is "required to carry out a continuing quality control program . . . covering determination of eligibility" (45 C.F.R. § 201.10(b)), to keep the county agencies informed "of the State policies, standards, procedures and instruction" (45 C.F.R. § 205.120), and to fix standards for the employment, training and conduct of the county agencies' personnel (45 C.F.R. §§ 205.200, 205.202). If responsibility must be fixed, a fair construction of the federal regulations must

place at least a substantial part of blame for the administrative errors at issue upon the state.

We advert now to the relevant statutes of California.

As pointed out, section 10615 (see fn. 4, *ante*) requires the Department to determine the "extent of state control needed over county [welfare] operations," and to exercise the necessary control, whether it be "general direction" or *"tight supervision."* (Italics added.) Neither this statute, nor any other that we have found, may reasonably be interpreted as fixing sole responsibility for the errors here in question, upon the state's several counties. Again, if such responsibility must be placed, even though the errors should exceed the federal "tolerance levels," such errors committed under state supervision and often by state approved employees over whose selection the counties have limited control, must under the statute reasonably be considered principally, or at least equally, the responsibility of the state vis-à-vis its counties.

Regulations of the Department must of course be consistent with related statutes of the state, or they are invalid. (See § 10553, subd. (d); *Morris* v. *Williams,* 67 Cal.2d 733, 737 [63 Cal.Rptr. 689, 433 P.2d 697]; *Rosas* v. *Montgomery,* 10 Cal.App.3d 77, 87-88 [88 Cal.Rptr. 907, 43 A.L.R. 3d 537].)

From the foregoing it appears that the superior court properly concluded that the applicable statutes (and federal regulations) give no support to the Department's purpose to hold the state's counties alone fiscally responsible for the administrative error here in question.

We have further concluded that no principle of law or equity otherwise supports the Department's appeal. Any effort to reduce the incidence of error in welfare administration is of course commendable. But, as pointed out, it would be wholly unjust to hold the state's counties alone responsible for error committed under state supervision, by eligibility workers, who must "liberally construe," and "promptly" apply, complex federal and state welfare laws and regulations.

The instant litigation seems to have its origin in a dispute between the participating states and the federal Department of Health, Education and Welfare. The latter agency continues to call upon the states to reduce the incidence of erroneous welfare payments; the last revision of its regulation, 45 Code of Federal Regulations section 205.40(b)(4), insists that "Prior to July 1, 1975, the State[s] shall set forth a schedule for further reducing erroneous payments." On the other hand the states' position is illustrated

by a letter of the appellant Department's Director[7] to the Department of Health, Education and Welfare. It insists that the "erroneous payments" or some of them, are *"generated by federal regulations"* (italics added); it further complains: "Although it was agreed that a joint federal-state task force should be established to review *federal regulations which contribute to errors,* we have not received further information on formulation of this group." (Italics added.)

The Department strenuously insists that it is not required to, and does not, supervise the county welfare departments in their "day-to-day" activities. This insistence does not comport with the command of section 10615 (see fn. 4, *ante*) that the Department exercise, where needed, a "tight supervision" over delinquent county welfare programs. Inherent in the Department's instant argument is the need for such "tight supervision."

Also relied upon heavily by the Department is section 15154 which provides: "Reports of amounts paid out for public assistance shall be presented by the respective counties at times and in the form prescribed by the department. Such reports shall be audited by the department and the State Controller, and, when and in the amount approved, shall be allowed to the county as a credit to apply against advances made under the terms of Section 15153." It is argued that the payments here in question, having been "disapproved" by the Department, were not allowable to the counties "as a credit." But such disapproval may not be arbitrary; it must be in accordance with law. Here, as we have noted, the counties may not lawfully be held solely responsible by the Department for the errors at issue. And it seems proper to point out that there are other reasons than such errors for auditing the county agencies' reports as, for instance, bookkeeping or arithmetical errors, and assurance that amounts claimed paid to welfare recipients have actually been paid.

The Department also urges that the counties, as *agents* of the state, must perform their duties "with diligence and due care" and failing to do so, are liable to their principal, the Department, for any loss caused thereby. But here it may not be said that the errors, universally found in public assistance administration, were necessarily caused by the counties' lack of "diligence and due care." As likely, they were the responsibility of the Department, or even as sometimes contended by that agency the federal Department of Health, Education and Welfare, or perhaps both.

The record furnished us lends no support whatever to the Department's argument that: "The [judgment] appealed from requires the state to bear

---

[7] We have taken judicial notice of this document (see Evid. Code, § 452, subd. (b)) after compliance with Evidence Code section 459.

the financial burdens of *all* errors, regardless which entity (federal, state or county) was 'to blame' as a matter of fact." Indeed, the counties themselves suffer the loss of their fiscal contribution (16 percent by Marin County) toward erroneous welfare payments. And we observe no demand (certainly none is pointed out) that the state account to the Department of Health, Education and Welfare for the portion of federal matching funds consumed by the improperly allowed categorical aid. Instead the federal agency has seemed content, without reimbursement, to accept the "3-percent" and "5-percent" tolerance levels we have previously mentioned. Moreover, within those limits the Department of Health, Education and Welfare, as previously pointed out, disclaims any need for "corrective action."

In the past the Department, finding errors as are in issue here, would charge the county for losses resulting from them. It is pointed out that no county complaint was ever made until the Department commenced extrapolating the percentage of error found, to the counties' entire welfare caseloads. But the earlier practice, as we have indicated, must have been consistent with statutory authority, to have been valid. We have concluded that it was not.

We have not, in this opinion, said that that responsibility and fiscal accounting for improper welfare payments may not on some reasonable basis be apportioned between the three concerned governmental agencies, federal, state and county. Instead, we have simply concluded that under pertinent statutes and regulations, and well-known principles of equity, California's counties are not obliged to bear the whole burden.

For the reasons stated the judgment and order of the superior court must be affirmed.

It has become unnecessary to the disposition of the Department's appeal to resolve the additional question whether "the state's plan for the projection of the results of a random sampling audit" was legally proper.

This opinion relates solely to the validity of the state's audit practice at the time judgment was entered in this case in May of 1972. We express no opinion on the method by which the cut in federal grants that may result from the operation of the federal "tolerance level" regulations should be distributed.

The "Judgment Granting Declaratory Relief and Permanent Injunction," as modified August 4, 1972, and the order denying defendants' "Motion to vacate judgment/injunctive order" are, and each is, affirmed.

Molinari, P. J., and Sims, J., concurred.

A petition for a rehearing was denied December 9, 1974, and the opinion was modified to read as printed above.