[Civ. No. 34656. First Dist., Div. One. May 16, 1975.]

MICHAEL REPKO, Plaintiff and Appellant, v.
ROBERT B. CARLESON, as Director, etc., Defendant and Respondent.

**COUNSEL**

Jack Siedman for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, Elizabeth Palmer, Assistant Attorney General, and Daniel Johnson, Jr., Deputy Attorney General, for Defendant and Respondent.

## OPINION

**SIMS, J.**—Petitioner has appealed from a judgment of the trial court denying a petition for writ of mandamus in which he sought an order commanding respondent director to set aside an order and decision issued on December 23, 1971, in which the petitioner was found ineligible for aid to the needy disabled (ATD) as then provided by the provisions of sections 13501 and 13550 of the Welfare and Institutions Code.[1] He contends that he was categorically denied aid because of a regulation which erroneously excluded anyone with a personality disorder from benefits, and that the director's decision is not supported by substantial evidence in the light of the entire record. An examination of these contentions indicates that there was not arbitrary application, by regulation or otherwise, of the statutory criteria for eligibility, and that the evidence sustains the director's determination. The judgment of the trial court must be affirmed.[2]

The record reflects that on October 20, 1970, petitioner, who was born October 22, 1944, applied for ATD. He stated that he lived alone, did most of the housekeeping, and was able to do 13 out of 16 housekeeping tasks easily. He reported difficulty in carrying groceries and other supplies and that he was unable to wash clothes by hand. He had completed the eleventh grade in high school and one year in college. He reported that he last held a steady job in 1965 when he worked for a year as an assembly line worker for an automobile manufacturer in Michigan.

[1]Section 13550 (as amended Stats. 1967, ch. 1585, § 5, p. 3795) was amended by Statutes 1971, chapter 578, section 38, page 1169, effective August 13, 1971, operative October 1, 1971, and together with section 13501 was repealed by Statutes 1973, chapter 1216, section 55, page 2923, effective December 5, 1973, and operative January 1, 1974.

Aid to the disabled is now apparently covered by "The Benton-Moscone-Bagley Citizen's Income Security Act for Aged, Blind and Disabled Californians." (Welf. & Inst. Code, div. 9, pt. 3, chs. 3 and 4, §§ 12000-12600.) (Stats. 1973, ch. 1216, § 37, pp. 2903-2918, effective Dec. 5, 1973, and operative Jan. 1, 1974.) The applicant's rights appear to be preserved by section 12151, which reads as adopted, "Persons who for the month of December 1973 were recipients of aid or *who had applied for and met all the eligibility conditions for aid under Chapter 3* (commencing with Section 12000), 4 (commencing with Section 12500), or *6 (commencing with Section 13500), of this part shall be eligible for benefits under this chapter during the period that they continue to meet the more liberal of the eligibility requirements in effect in December 1973 or after January 1, 1974.*" (Stats. 1973, ch. 1216, § 37, p. 2906, italics added.) No opinion is expressed as to the effect of subsequent amendments limiting eligibility. (See § 12151, as amended Stats. 1974, ch. 75, §§ 1, 17 and 18, effective Mar. 14, 1974, as an emergency measure to be effective Jan. 1, 1974.

[2]A third contention that the applicant is entitled to attorney's fees, if successful in appeal (see Welf. & Inst. Code, § 10962; and *Trout v. Carleson* (1974) 37 Cal.App.3d 337, 343 [112 Cal.Rptr. 282]), is rendered moot by the decision to affirm the trial court's judgment.

■■■■■

He listed eight various clerical and other jobs at which he had been employed for brief intervals during 1966 and 1967. He disclosed that he had been fired from three for tardiness, absenteeism and falsifying records, respectively; he had quit four jobs because of inability to work with his superiors, long hours, inadequate pay, and inability to handle his responsibilities, respectively; and showed no cause for terminating the remaining one. He stated that he was not under treatment or taking any medicine at the time of the application, that he had last been seen by a doctor in July 1969, and that his last hospitalization had been in 1965 in a state hospital in Michigan. He wrote, "I have some kind of brain damage that causes memory loss at frequent intervals. I'm very mentally and emotionally unstable, and haven't been able to hold a steady job for over five years. I can't keep my mind on anything for any length of time without experiencing extreme anxiety. Also can't sit still or stay in one place any length of time. I have a nervous condition that is physically visible, I'm very thin, and feel weak most of the time, though my appetite is usually good. My condition has steadily gotten worse over the past five years. I feel the emotional trauma of being in Soledad Prison one year, is the greatest cause of my condition. I have tried and tried to 'get it together' without assistance but always without success."

Dr. Terman examined petitioner the following day, and under date of November 18, 1970, reported the following history: "This 26 year old, unmarried, white male states that he has been unable to work steadily since 1965. He notes that he can usually only work for a few weeks at a job and then leaves because of difficulty relating to people. His difficulties seem chronic in that he was first in psychiatric treatment during junior and senior high school and was an outpatient for some period during his college years. He states that treatment was helpful because he was suicidal at the time that he started treatment. The longest period he has worked at one job was one year. With regard to work, he states that he 'feels able to work but can't think of a job I'd want.' This patient has a fairly extensive prison record and has spent a total of 2-1/2 years in prisons. He has been convicted on shoplifting and narcotic charges and was last imprisoned from August 1969 to August 1970." The doctor reported his observations as follows: "This patient was neatly but unusually dressed. He wore a cap which he did not remove and also wore black and orange leather shoes. He carried a very large portable radio with him. He related in a superficially friendly and cooperative manner. His speech was coherent but at times vague with regard to detail. He spoke fairly rapidly and included in his description of his past activities his feigning of illness in a jail and his subsequent escape from

the hospital to which he was sent. There was no evidence of thought disorder or other symptoms of psychosis or significant depression. There was no disturbance of orientation or memory. He states that he did not want to get institutionalized and has no plans or desire for treatment. He was vague with regard to his inability to work, at first noting that not much work was available and then adding that he couldn't think of a job that he would like." Dr. Terman gave the following diagnosis: "Antisocial personality (sociopathic personality disorder)."[3] He stated that the prognosis with regard to basic personality changes was poor; that there were no specific stresses to be avoided; and that there were psychological barriers to employment, but he saw no clear evidence of a psychiatric disorder which would prevent competitive employment.

A clinical psychologist, under date of October 24, 1970, concluded, on the basis of his observation of the petitioner and the results of three tests he administered, as follows: "This man certainly does not show any handicap along intellectual lines. His intellectual abilities, in fact, are quite outstanding. There are some personality problems present, as well as some emotional difficulties, too, but these do not appear to be of sufficient magnitude to make it impossible for him to function in a number of possible work settings. Mr. Repko, therefore, does not seem to be seriously handicapped for work, at least insofar as his psychological functioning is concerned."

The medical reports, together with other pertinent medical and social information, were forwarded to a state ATD Review Team. The team, consisting of a physician and a social worker, gave the same diagnosis as Dr. Terman, and checked a block on the form reading "Dysfunctioning is basically social in nature." The county denied the application on January 15, 1971.

Meanwhile, on December 6, 1970, petitioner fell down a cliff and fractured his right femur. A splint was placed on his leg and he was maintained in skeletal traction for 10 weeks at San Francisco General Hospital. The hospital report recites, "During the hospital course the patient was actively hallucinating. He also showed irrational and

---

[3] The following appears in Black's Law Dictionary (rev. 4th ed. 1968), page 1392, "Psychopath. Person having mental disorder. More commonly, mental disorder not amounting to insanity or taking the specific form of a psychoneurosis, but characterized by a defect of character or personality, eccentricity, emotional instability, inadequacy or perversity of conduct, under conceit and suspiciousness, or lack of common sense, social feeling, self-control, truthfulness, energy, or persistence. Mutual Life Ins. Co. v. Frost, C.C.A.R.I., 164 F.2d 542, 545. [¶] Synonymous with 'sociopathic personality'."

impulsive behavior (throwing things at the staff). The patient was maintained on Valium and Thorazine with reasonable success except for occasional outbursts." On his original discharge February 16, 1971, he was diagnosed as follows: "1. Right femur fracture, midshaft. 2. Drug abuse. 3. Personality disorder (impulsive behavior)."

On March 18, 1971, petitioner filed his request for a fair hearing before the State Department of Social Welfare. He alleged, "I am unable to hold a job because of my mental condition. I've been seeing psychiatric people since I was ten years old," and he set forth the names of three Michigan and three California institutions from which he had allegedly received treatment, and, in addition, the United States Navy. He set forth the intervening injury to his leg, stated he was under a doctor's care in the outpatient department at San Francisco General Hospital for both his physical and mental condition, and claimed that he was unable to support himself because his mental disability was permanent.

A hearing was held on June 14, 1971. The application and reports and records upon which the denial was predicated were received in evidence. In addition the county produced a letter sent to the applicant May 19, 1971, which purported to set forth the basis of the denial and advised him of the right to have counsel at the hearing. The contents of this letter are reviewed below (part I). A further report indicated that applicant had been admitted to San Francisco General Hospital on May 5, 1971, for reapplication of his cast and was discharged May 13, 1971, with a prognosis of "Good." The report indicates that he had previously broken three walking casts,[4] and that on one occasion, after a new cast was applied on May 10, "Patient was found to be walking on it the first day after it was applied. Patient was to be sent to LHH but refused and again did not follow our treatment regimen. He subsequently signed out AMA with false signature."

---

[4]In support of his petition for rehearing petitioner submitted further records of San Francisco General Hospital. The first showed his original admission December 8, 1970, and discharged on February 16, 1971, as has been related above. The report of a second admission, April 14, 1971, indicates that petitioner was to be recast in a long-leg cast. This report recites, in part: "The patient was known to have psychiatric disorders, with explosive behavior and outbursts, and was placed on Thorazine and Valium. . . . [¶] The impression was of a healing right femoral fracture, history of Methedrine abuse and personality disorder. . . ." It indicates that a cast applied on April 17 was broken up, as was, as well, a replacement cast applied April 20, on which day the patient left the hospital. A third report indicates that petitioner was readmitted on April 23, and discharged on April 27, 1971, with a good prognosis, after a third cast was applied.

Applicant was examined by a resident in psychiatry from the San Francisco General Hospital on June 23, 1971. He reported on July 7, 1971. In giving petitioner's history while hospitalized for his broken leg the doctor observed, "Noted to hallucinate and act impulsively (throwing things) discharged to Laguna Honda on 2/16/71. Since then he has repeatedly walked on cast, breaking it and requiring several hospitalizations to refit cast. . . ." The doctor further reported a history of chronic drug abuse, and stated questionably that petitioner had indicated psychotic behavior during his December through February hospitalization. He described the petitioner's general appearance and mental attitude as an uncooperative young white male. He diagnosed him as suffering from the broken leg (of temporary nature, with a good prognosis), chronic drug abuse and a questionable personality disorder.

A more detailed report was submitted under date of June 22, 1971, by Dr. Gabby, a board-eligible psychiatrist, who examined petitioner on June 14, 1971. The doctor reviewed the applicant's employment history and noted the injury to his leg. He detailed applicant's family history, from his birth out of wedlock, to his life with his maternal grandparents, and later with his mother and his stepfather, by whom he was adopted. He reports the applicant recalled "that he had much psychological difficulty while in school while growing up and was constantly sent to school counselors, psychotherapists, etc." The history further reveals a Navy career terminated by an undesirable discharge because he had been AWOL so much, numerous arrests, and a one-year prison sentence for escape from a county jail, from which he was released in August 1970, drug usage, attempts at psychotherapy in 1965 and prior thereto, and a year at junior college in which he received all A's and B's and was on the Dean's list. He reportedly had some hallucinations which were not related to drug use. The doctor concluded, "It is my impression, then, that he is suffering from a Chronic, Schizophrenic Reaction, as evidenced by his difficulty in retaining his jobs, his difficulty relating to people or maintaining any kind of long-term intimate relationship, his extreme difficulty in school, and of course it does relate to his own early origins, his illegitimacy, his relationship with his adoptive father and difficulty getting along with his mother. Prognosis remains extremely guarded unless he can get some long-term help, and I am not sure he can sit still long enough to get the help he needs. Thus the prognosis remains guarded."

At the hearing the applicant testified that he had attended the Huron Valley Child Guidance Center in Michigan for about 2 years when he

was 13 years old, but was discharged because he could not be helped without his mother's cooperation, which was not forthcoming. He later saw psychiatrists for about 6 months when 16, while at the CYO Home for Boys in Detroit, and thereafter was again referred to psychiatrists in the Navy when he was 18 and was involved in a series of absences without leave and petty theft from the Navy Exchange. On his undesirable discharge from the Navy, he had to serve six months for a civilian offense and was sent to Ypsilanti State Hospital. He then completed his one year of college but dropped out in 1965 and came to San Francisco. There he had intermittent employment in 1966 and 1967 and went to the Center for Special Problems. In 1968 and 1969 he got by with just hustling—"selling dope a little bit, doing things like that and stealing a little bit and basically [he] felt pretty good . . . ." In 1969 he was convicted for possession of marijuana, then escaped from jail, and was sent to prison for a year for the latter offense—he termed the service of the prison sentence "a pretty traumatic experience." He returned to Michigan for two months on his discharge in August 1970, then came back to San Francisco, and when unable to find work applied for ATD. He expressed his desire to be a taxi driver, was frustrated by his youth and criminal record, and then, when he hoped to get such employment after attaining age 26, and living a year without getting into trouble, he broke his leg. He stated he was frustrated and raised "hell" in the hospital in order to be put back on morphine. He also reviewed his employment history which indicated he left work as a postal clerk after three days because he could not get along with the foreman; he was fired as a clerk for being tardy three times in the week he worked; and he was fired as a baggage clerk at the end of one month because of missing two day's work. He acknowledged he enjoyed furniture repair work which he had done before going to prison. On release from prison he found no work in Michigan because of labor troubles, and on his return to San Francisco he could not get hired before he broke his leg. He concluded by stating, "I don't know how long this is going to be—I think about another year my leg will be all right—you know—so that's the reason for my disability."

On October 26, 1971, the referee rendered his proposed decision that the claim be denied.[5] This decision was adopted by the department

---

[5]The decision reads in part: "REASON FOR DECISION" [¶] "I. Under the provisions of Section 13501, W&IC, as implemented by Section 42-203, MPP, an applicant in order to qualify for ATD must have a medically verifiable total and permanent impairment which substantially prevents him from engaging in a useful occupation within his competence such as gainful employment or homemaking. [¶] II. Based on the preponderance of the evidence introduced during the course of the hearing, including

director, December 23, 1971. On January 7, 1972, the applicant, through his attorney, requested a rehearing because the applicant had been hospitalized for a gunshot wound. Three days later he forwarded full reports of the treatment for the broken leg (see fn. 4 above), and a medical report indicating that applicant was treated on January 6, 1972, for a gunshot wound of the left leg. On February 7, 1972, the request for a rehearing was denied.

On February 23, 1972, petitioner filed his petition for a writ of mandamus. He alleged that he was subsisting on an $83 per month grant of general assistance. He set forth the nature of the proceedings that had transpired in connection with his application for ATD and specifically pointed out: "The referee's decision did not refer specifically to any of the medical evidence which was part of the record in the case, and did not indicate what evidence was relied upon in reaching the decision"; and with respect to the director's adoption of the decision, "This adopted decision did not identify any of the medical evidence submitted in the case, and failed to specify on which evidence the respondent based his decision." He complained (1) "Respondent failed to proceed in the manner required by law in adopting and issuing a fair hearing decision which did not specifically indicate the evidence upon which he relied in reaching his decision"; and (2) "Respondent abused his discretion in adopting the referee's Proposed Decision and in issuing a decision which is not supported by substantial evidence in light of the record taken as a whole." Points and authorities submitted in support of the petition urged each of these two points. An alternative writ of mandate issued on order of the court.

Before answering, the director, in the light of *Rogers* v. *Carleson,* 30 Cal.App.3d 54 [106 Cal.Rptr. 140], decided January 3, 1973 (hg. by the Supreme Court den. Mar. 29, 1973), on February 27, 1973, secured a stipulation that he could rewrite his decision to provide the reasons therefor, if such revised decision was completed and served within 30 days. The court approved that stipulation and the further stipulation that the matter be set for hearing on April 3, 1973. On March 26, 1973, the director rendered his own decision pursuant to the stipulation. It set aside the earlier decision of December 23, 1971, but also denied the claim. After reciting the history of applicant's request for

the County Social Information Report, the State Medical Review Team DM-3, and medical reports, it is found that claimant's impairments are not sufficient to qualify for ATD and, therefore, the county denial action must be sustained."

a fair hearing the decision added a new paragraph reading: "IV After thorough consideration of all oral and documentary evidence introduced during the course of the hearing the preponderance of such evidence· establishes that: [¶] The claimant is a 26-year-old single male who resides with a friend. [¶] Claimant's education or training has consisted of some college. [¶] Work experience has been primarily as a clerk and assembly line worker. [¶] Claimant's major complaints are brain damage, memory loss, unstable mentally and emotionally and anxiety. [¶] Medical reports from a number of physicians who examined the claimant were introduced during the course of the hearing. All such reports have been considered. Those reports, valid within the provisions of MPP Sections 41-311.1 and 41-313.12, upon which this decision is based are: . . ." There follows a summary of the reports of Doctors Terman and Katz.

The director gave the following reasons for his decision: "I Under the provisions of Section 13501, W&IC, as implemented by Section 42-203, MPP, an applicant in order to qualify for ATD must have a medically verifiable total and permanent impairment which substantially prevents him from engaging in a useful occupation within his competence such as gainful employment or homemaking. [¶] II Based on the preponderance of the evidence introduced during the course of the hearing, including the County Social Information Report, the State Medical Review Team DM-3, and medical reports, it is found that claimant's impairments are not sufficient to qualify for ATD and, therefore, the county denial action must be sustained."

Petitioner renewed his attack on the revised decision on the grounds that the reasons for the decision did not identify the supporting evidence. (See *Rogers* v. *Carleson, supra,* 30 Cal.App.3d 54, 58, quoting 45 C.F.R., § 205.10, subd. (a)(15).) This contention overlooks the reference to the reports of Doctors Terman and Katz in the body of the decision, and is contradicted by petitioner's further argument that the director erred in relying on outdated medical reports to the exclusion of those currently obtained for the July 14, 1973, hearing. This latter argument is not pursued before this court. He further urged, as he does herein, that the director followed criteria previously declared improper in finding that the applicant was not disabled as contemplated by law.

Following the hearing and the submission of supplementary briefs, as requested by the court, the court gave its notice of intended decision and judgment was entered denying the petition. This appeal ensued.

I

The general qualifications for aid to the needy disabled were found in section 13550 of the Welfare and Institutions Code.[6] No question has been raised as to the applicant's qualifications if he was found otherwise disabled. At all pertinent times the grant of aid was governed by the definition found in section 13501.[7]

In its letter of May 19, 1971, explaining the denial of his application the county wrote in part as follows: "The San Francisco Department of Social Services recorded your application for ATD on October 20, 1970. Medical reports were obtained and these reports, along with other pertinent medical and social information, were forwarded to a State ATD Review Team. The Team, consisting of a physician and a medical social worker, disapproved your application and notified the county on January 8, 1971 that 'Disfunctioning is basically social in nature.'

"On the authority of the Team's decision the county denied your application for ATD on January 15, 1971. This action was in agreement with Section 42-203 of the Public Social Services Manual [8] which

---

[6]At the time the director adopted the original decision, December 23, 1971, section 13550 provided as follows: "Aid shall be granted under this chapter to any needy disabled person who comes within all of the following descriptions: [¶] (a) Who has attained the age of 18 years. [¶] (b) Who has not made any voluntary assignment or transfer of property for the purpose of qualifying for aid. [¶] (c) [Special provisions for inmates or patients of designated institutions.] [¶] (d) Who is not receiving adequate support from a husband or wife, or parent, or child." (Stats. 1971, ch. 578, § 38, p. 1169, effective Aug. 13, 1971, and operative Oct. 1, 1971 [see §§ 42 and 43, p. 1173].) The 1971 amendments deleted residence requirements found in the earlier statute which was in effect when applicant applied for aid and was originally rejected. (Cf. Stats. 1967, ch. 1585, § 5, p. 3795.)

[7]Section 13501 provided: "When used in this chapter, the following words shall have the meanings ascribed to them in this section: [¶] (a) 'Needy disabled person' means a person who meets the eligibility requirements set forth in this chapter and who is both permanently impaired and totally disabled. [¶] (b) 'Permanently impaired' means that the individual has a major physical or a major mental impairment, or a combination of both, which is verified by medical findings and appears reasonably certain to continue throughout the lifetime of the individual without substantial improvement. [¶] (c) 'Totally disabled' means that the impairment substantially precludes the individual from engaging in useful occupations within his competence, such as holding a job or homemaking. Employment in a sheltered workshop or under an approved vocational rehabilitation plan shall not be considered a 'useful occupation' for purposes of this chapter." (Stats. 1965, ch. 1784, § 5, p. 4050.)

[8]The director has broad powers to formulate, adopt, amend or repeal "regulations and general policies affecting the purposes, responsibilities, and jurisdiction of the department and which are consistent with law and necessary for the administration of public social services. [¶] All regulations heretofore adopted by the board shall remain in effect and shall be fully enforceable unless and until readopted, amended or repealed by the

requires that 'the applicant shall have a major medically verifiable physical, mental or emotional impairment that substantially prevents him from engaging in a useful occupation within his competence.' The same section also requires that the disability be permanent, ' . . .that is: likely to be of long continued or indefinite duration or in a terminal

---

director." (Welf. & Inst. Code, §§ 10553, subd. (d), 10554, 10604 and 10060; and see *Rosas* v. *Montgomery* (1970) 10 Cal.App.3d 77, 82, fn. 5 [88 Cal.Rptr. 907, 43 A.L.R.3d 537].) By recodification, October 1, 1971, effective December 20, 1971 (prior to the original decision in this case), terms similar to those quoted above from prior regulation 42-203 were set forth in regulation 41-303 in Manual of Policies and Procedures, Eligibility and Assistance Standards, as published by the Department of Benefit Payments of the State of California. This regulation reads in pertinent part as follows:

"41-303 DEFINITION OF PERMANENT AND TOTAL DISABILITY

".1 *General Requirement* [¶] The applicant shall have a major medically verified physical or mental impairment or combination of impairments. These impairments shall be permanent and total and substantially prevent him from engaging in a useful occupation within his competence, such as gainful employment or homemaking.

".11 *Qualifying Medical Impairments* [¶] Any major physical or mental condition or disease which is irremediable in nature and expected to last throughout the lifetime of the individual and which totally disables the individual may be considered a disability for the purpose of *ATD*.

".12 *Two or More Impairments* [¶] A person may have two or more impairments, neither of which alone may be severe enough to qualify him, but the combined impairments are evaluated by the ATD Review Teams in light of their combined effect upon the person's ability to engage in a useful occupation.

".13 *Nonqualifying Criteria* [¶] .131 Unemployability for other than medical reasons is not a qualifying criterion.

".2 *Determination of Disability* [¶] The disability determination takes into account not only the diagnosis but the stage of the impairment, the person's response to his illness or condition, remedial services available to the individual and the amount of risk involved in possible treatment.

".21 *Permanent Disability* [¶] For the disability to be considered permanent, the impairment(s) of major importance must be expected to continue throughout the lifetime of the individual; that is: (1) likely to be of long continued or indefinite duration or in a terminal stage; and (2) unlikely to improve through any known and generally accepted medical treatment or be diminished through such treatment to the extent that it ceases to be of major importance, even though partial improvement may be expected. . . .

".22 *Total Disability* [¶] To be totally disabled, the person must be substantially prevented by reason of his permanent impairment from engaging in a useful occupation within his competence. . . .

".221 *Substantially Prevents* [¶] A person is substantially prevented from engaging in a useful occupation (1) if he is unable to perform activities required by gainful employment well enough, for a sufficient number of hours or with sufficient regularity to receive substantial and predictable remuneration for such employment; or (2) . . .

".222 *Competence* [¶] Competence means that the impairment substantially prevents performance of activities required by any useful occupation for which the individual is fitted by training, education, or work experience and which exists in the community. Competence is based on age, education, training, and psychological make-up.

".3 *Useful Occupation* [¶] .31 *Useful Occupation — Employment* [¶] Useful Occupation refers to gainful employment for which there is a return in wages. It does *not* include activities primarily of a therapeutic or rehabilitative value, even though there may be some money return for the activity. A useful occupation may be seasonal if performed regularly each year. . . ."

stage; and 2) unlikely to improve through any generally accepted medical treatment. . .'

"In summary, the ATD Review Team determined that your disability did not meet the requirements of the above regulations and this is the basis of the denial action."

The adverse decision of December 23, 1971, referred to the provisions of section 13501, as implemented by section 42.203 MPP, despite the amendment and renumbering (see fn. 8 above). The revised decision of March 26, 1973, referred to section 13501 as implemented by section 41-303 MPP, the pertinent provisions of which have been set out in the margin *(id)*.

Petitioner does not attack the provisions of the statute and the foregoing regulations which require that the applicant have "a major physical or a major mental impairment, or combination of both, which is verified by medical findings and appears reasonably certain to continue throughout the lifetime of the individual without substantial improvement." ■ He contends that the director has adopted "Disability Guides and Standards" which arbitrarily exclude applicants who are otherwise qualified and eligible for ATD. Legal support for this argument is found in the following principle: "Administrative regulations that alter or amend the statute or enlarge or impair its scope are void and courts not only may, but it is their obligation to strike down such regulations. [Citations.]" *(Morris* v. *Williams* (1967) 67 Cal.2d 733, 748 [63 Cal.Rptr. 689, 433 P.2d 697]. See also *Mooney* v. *Pickett* (1971) 4 Cal.3d 669, 679 and 681 [94 Cal.Rptr. 279, 483 P.2d 1231]; *Bertch* v. *Social Welfare Dept.* (1955) 45 Cal.2d 524, 534 [289 P.2d 485]; *County of Marin* v. *Martin* (1974) 43 Cal.App.3d 1, 8 [117 Cal.Rptr. 364]; *Zunino* v. *Carleson* (1973) 33 Cal.App.3d 36, 38-39 [108 Cal.Rptr. 769]; and *Rosas* v. *Montgomery* (1970) 10 Cal.App.3d 77, 87-88 and 92 [88 Cal.Rptr. 907, 43 A.L.R.3d 537].)

In *Rosas* v. *Montgomery, supra,* the court considered an earlier PSS regulation which arbitrarily excluded persons suffering solely from alcoholism from benefits.[9] The court concluded, "To qualify the afflicted person for ATD, his 'impairment' must be 'major' and either 'physical' or 'mental' under the statute, and both permanent and 'totally' disabling

---

[9]This regulation is quoted in *Rosas* v. *Montgomery, supra,* as follows:
"PSS § 42-205.2. Nonqualifying Personality Disorders. Persons with the following personality disorders are ineligible [for ATD] in the absence of other major physical

within its meaning. (§ 13501.) Appellant was not disqualified because alcoholism cannot, or because his alcoholism did not, fail in any of these respects. Whether it can be any or none of these things presented questions to be resolved by evidence, not by regulation or—because of the courts' limited knowledge of the subject [citation] by judicial decision. None of these questions was reached here because the regulation (PSS § 42-205.2) operated to preclude consideration of any of them once appellant had been determined to be an alcoholic in fact.

"For the reasons previously indicated, we hold that the regulation, so applied, is invalid because (1) it conflicts with the 'purpose of the [ATD] statute' (Gov. Code, § 11374; . . .); and because (2), purporting to preclude alcoholism, by definition, as a qualifying ATD 'impairment,' in the absence of perceptible legislative intent that this be done or permitted, the regulation operates to 'alter or amend the statute or . . . impair its scope . . .' [Citation.] 'When . . . [an administrative regulation] . . . is inconsistent with the statute it must, of course, give way.' (*Marion* v. *Gardner, supra,* 359 F.2d 175 at p. 181.)" (10 Cal.App.3d at p. 92. See also *Zunino* v. *Carleson, supra,* 33 Cal.App.3d 36, 43; and *Jacobs* v. *California Unemployment Ins. Appeals Bd.* (1972) 25 Cal.App.3d 1035, 1039-1040 [102 Cal.Rptr. 364].)

In this case, however, there was no categorical denial of benefits because of the diagnosis of the appellant's condition. The review team found that "Dysfunctioning is basically social in nature," and diagnosed the applicant as "anti-social personality (sociopathic personality disorder)." The original denial of benefits was predicated upon the lack of a major medically verifiable physical, mental or emotional impairment which substantially prevented him from engaging in a useful occupation within his competence. This finding was echoed in the original decision on the fair hearing approved in December 1971. In the amended decision approved March 23, 1973, the director concluded: "Based on a

impairments or underlying psychiatric illness: (See Diagnostic and Statistical Manual of the American Psychiatric Association, Second Edition, for definition.)

| "Antisocial Personality | 301.7 |
| "Sexual Deviations | 302 |
| "Alcoholism | 303 |
| "Drug Dependence | 304." |

(10 Cal.App.3d at p. 83, fn. 7.)

The regulations, as recodified October 1, 1971, and effective December 20, 1971 (see fn. 7 above), do not contain the foregoing language. Regulation 41-303.212 reads, "Obesity, alcoholism, or continued smoking in the face of a diagnosis which contraindicates, shall not disqualify the person for aid if his medical condition has reached a level of severity which indicates disability."

preponderance of the evidence introduced during the course of the hearing, it is found that claimant's impairments are not medically verified total and permanent physical or mental impairments." The record on its face fails to show that ATD was denied because of the application of arbitrary rules not warranted by the governing statute.

In points and authorities filed with the trial court the director referred to State Department of Social Welfare (now Health and Welfare Agency) "Disability Guides and Standards." A discussion of "The Antisocial or Sociopathic Personality" designates the group as follows: "Other diagnostic terms formerly used to designate this group were 'constitutional psychopathic state' and psychopathic personality. The terms usually used today are sociopath or antisocial personality." Examples are given stressing the lack of true psychotic "projection" and the principle that such persons are considered legally responsible for their actions. The analysis concludes: "Unless the sociopath has a disabling physical illness or his behavior is the reflection of a substantiated mental illness we must consider the sociopath as socially disabled instead of medically impaired. In other words his dysfunctioning is basically social in nature. (See pages 40, 41-41B)." (SDSW Disability Guides and Standards (June 1971) p. XXVIII.)

Petitioner notes the similarity of terms found in the report of the review team and in the guides and asserts that the review team, the county and the director have relied upon an arbitrary standard which does not properly carry out the intent of the ATD legislation. This contention cannot be sustained. In the first place, the guides and standards are not meant to be arbitrary gauges of eligibility under the act. The "Introduction" states, "The principal purposes of the Disability Guides and Standards are as follows: [¶] 1. To convey SDSW policy to the review team members; [¶] 2. To assist in achieving the uniformity among teams in arriving at decisions, in order to assure the same treatment to all applicants with similar medical impairments; and [¶] 3. To assure that, insofar as possible, relatively equal weight is given to major identifiable social factors, such as age, education, vocational history and literacy, in respect to disability." (SDSW Disability Standards (rev. 2, Oct. 1971).) The "Instructions for Use of the Standards" stress that an individual whose impairment or combination of impairments has reached the severity described in the standard must be approved. Provision is made for departure from standards to allow disapproval in exceptional circumstances on review by higher authority. Cases falling under the standards are referred to as follows: "*The Guides*

*and Introductory Sections* [¶] These sections of the Disability Manual have been designed to give guidance to the professional person in those instances where the applicant's level of severity does not meet the Standard, but is sufficiently severe so that disability may exist. The Guides attempt to take into account the social factors, such as age, education, vocational skill, personal appearance, and other factors which, together with the medical, may produce disability in an individual situation." (SDSW Disability Standards (rev. 4, July 1972) p. IV.)

In *Rosas* v. *Montgomery, supra,* the court followed its holding, as quoted above, with the following comment: "As in *Marion* [*Marion* v. *Gardner* (8th Cir. 1966) 395 F.2d 175] and because the regulation might be valuable as a 'general guide,' we do not invalidate it in all respects; we hold only that it cannot be invoked, as occurred here, to establish a 'complete barrier' to appellant's 'qualification under the statute.' (*Id.* [p. 181].)" (10 Cal.App.3d at p. 92.) So here, on analysis the guides and standards are found to be not rigid rules of exclusion, but aids to diagnosis and communication to insure some uniformity. The fundamental test is whether the claimed disability falls within the terms of the statute.

Recourse to the references given on page XXVIII of the guides and standards (see above), fortifies the conclusion that there is to be no arbitrary exclusion of an individual whose dysfunctioning is verifiable by medical findings. The references review "Personality (Character) Disorders." It is pointed out that ". . . in disability determination we are faced with making determinations of eligibility on people who to us seem lazy, shiftless, and guilty of gross misconduct, malingering, or willful neglect." (SDSW Disability Standards (rev. 1, Sept. 1971) p. 40.) The text notes, "The individuals who are most likely to apply to ATD because of their personality disorders are the people with inadequate schizoid, or paranoid personalities, the emotionally unstable and the sociopaths." *(Id.)* It concludes with the following *"Standard* [¶] 1. A finding of disability shall be made when the applicant has another well documented major medical impairment of sufficient severity to be considered borderline in nature as far as disability is concerned. In these instances, the individual who has a personality disorder cannot be expected to successfully cope with these problems and is considered to be disabled; or [¶] 2. The major impairment consists of a schizoid, or paranoid personality and documentation shows that this has been a barrier to employment for a considerable period of time. Brief and unsuccessful attempts at employment may substantiate the inability to function and

the applicant should not be penalized for these attempts; and [¶] The diagnosis has been made by a board certified or board eligible psychiatrist who considered the prognosis to be poor." (*Id.,* p. 41.)

The issue is therefore framed in the guides and standards in the context found in the statute: Does the applicant have "a major physical or a major mental impairment, or a combination of both, which is verified by medical findings and appears reasonably certain to continue throughout the lifetime of the individual without substantial improvement." (§ 13501.) There being no categorical application of an improper regulation, the question remains whether the record sustains the revised decision adopted by the director.

## II

Welfare and Institutions Code section 10962 provides in pertinent part, "The applicant or recipient or the affected county, within one year after receiving notice of the director's final decision, may file a petition with the superior court, under the provisions of Section 1094.5 of the Code of Civil Procedure, praying for a review of the entire proceedings in the matter, upon questions of law involved in the case. Such review, if granted, shall be the exclusive remedy available to the applicant or recipient or county for review of the director's decision." "Since review of a decision by the director is limited to questions of law (§ 10962), a trial court's function in considering the evidence is limited to determining whether the director's findings are supported by substantial evidence in light of the whole record. (Code Civ. Proc., § 1094.5; *County of Contra Costa* v. *Social Welfare Board* (1962) 199 Cal.App.2d 468, 473 . . . .) The role of the trial court and of the appellate court begins and ends with a determination of whether substantial evidence, contradicted or uncontradicted, supports the conclusion of the director. [Citations.]" (*Henderling* v. *Carleson* (1974) 36 Cal.App.3d 561, 567 [111 Cal.Rptr. 612]. See also *Bertch* v. *Social Welfare Dept., supra,* 45 Cal.2d 524, 529; *Taylor* v. *Martin* (1972) 28 Cal.App.3d 1057, 1059 [105 Cal.Rptr. 211]; *Stratton-King* v. *Martin* (1972) 28 Cal.App.3d 686, 690 [104 Cal.Rptr. 916]; *Rosas* v. *Montgomery, supra,* 10 Cal.App.3d 77, 86; *County of Contra Costa* v. *Social Welfare Board* (1962) 199 Cal.App.2d 468, 472-473 [18 Cal.Rptr. 573].) In *Bertch* v. *Social Welfare Dept., supra,* the court observed, "Petitioners here were not possessed of a vested right, but the right to make application for old age benefits provided that they were able to comply with the statutory prerequisites therefor (Welf. & Inst. Code, § 2160 et seq.) It would appear, therefore, that petitioners were not entitled

to a trial de novo in the superior court." (45 Cal.2d at p. 529. See also *Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 137-148 [93 Cal.Rptr. 234, 481 P.2d 242]; *Stratton-King* v. *Martin, supra,* 28 Cal.App.3d 686, 690, fn. 2; and *County of Contra Costa* v. *Social Welfare Board, supra,* 199 Cal.App.2d 468, 473. Cf. *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 44-45 [112 Cal.Rptr. 805, 520 P.2d 29]; and *Bixby* v. *Pierno, supra,* 4 Cal.3d 130, 137-147.)[10]

The phrase "in the light of the whole record" as found in section 1094.5 of the Code of Civil Procedure is analogous to the expression "based upon the entire record" as found in section 5952 of the Labor Code. With respect to the latter section the Supreme Court has said, "In reviewing the evidence our legislative mandate and sole obligation under section 5952 is to review the entire record to determine whether the board's conclusion was supported by substantial evidence. [Citations.]" *(LeVesque* v. *Workmen's Comp. App. Bd.* (1970) 1 Cal.3d 627, 637 [83 Cal.Rptr. 208, 463 P.2d 432].) ▮▮ There the court also noted, "The referee and appeals board 'must accept as true the intended meaning of [evidence] both uncontradicted and unimpeached.' (*McAllister* v. *Workmen's Comp. App. Bd., supra,* 69 Cal.2d 408, 413.)" (*Id.,* at p. 639. See also *Lamb* v. *Workmen's Comp. Appeals Bd.* (1974) 11 Cal.3d 274, 281 [113 Cal.Rptr. 162, 520 P.2d 978]; and *Garza* v. *Workmen's Comp. App. Bd.* (1970) 3 Cal.3d 312, 317-318 [90 Cal.Rptr. 355, 475 P.2d 451].) In the case last cited the court also prescribed, ". . . although the board is empowered to resolve conflicts in the evidence [citations], to make its own credibility determinations [citations], and upon reconsideration to reject the findings of the referee and enter its own findings on the basis of its review of the record [ citations], nevertheless, any award, order or decision of the board must be supported by substantial evidence in the light of the entire record [citations]." (3 Cal.3d at p. 317. See also *Lamb* v. *Workmen's Comp. Appeals Bd., supra,* 11 Cal.3d 274, 281.) The court added, "In *LeVesque, supra,* this court rejected prior decisions which suggested that the board's decision would be sustained if supported by any evidence whatsoever, and we determined that the test of substantiality must be measured on the basis of the entire record, rather than by simply isolating evidence which supports the board and ignoring other relevant facts of record which rebut or explain that evidence. (1 Cal.3d at pp. 638-639, fn. 22.)" ( *Id.* See also *Bixby* v. *Pierno, supra,* 4 Cal.3d 130,

---

[10]In *Le Blanc* v. *Swoap* (1974) 1 Civ. No. 34379. Div. Four, an opinion was filed November 8, 1974 (42 Cal.App.3d (adv.) 1016), indicating that the independent judgment test should be applied in reviewing a decision *terminating* ATD benefits. A rehearing was granted December 6, 1974, and the matter is pending.

149, fn. 22; and 5 Witkin, Cal. Procedure (2d ed. 1971) Extraordinary Writs, § 237, p. 3988.)

Petitioner properly contends that the referee and the director are bound by similar rules in this case. He suggests that in making his revised decision the director made no reference to the favorable report of Dr. Gabby, the psychiatrist who examined petitioner, June 22, 1971, shortly before the fair hearing. The record does not support that contention insofar as it infers that the director did not consider the report. The revised decision recites: "Medical reports from a number of physicians who examined the claimant were introduced during the course of the hearing. *All such reports have been considered.* Those reports . . . upon which this decision is based are: . . ." (Italics added.) It then goes on to refer to conclusions expressed by Dr. Terman, the psychiatrist who examined the petitioner October 21, 1970, and by the psychologist, Dr. Katz, who examined him October 24, 1970. In relying on these reports the director did not fail to consider Dr. Gabby's reports, he merely indicated that he found them worthy of more weight, and rejected any conclusions of Dr. Gabby which were inconsistent with the conclusions expressed by the earlier examiners.

Examination of the reports rendered by Dr. Terman and Dr. Katz does not indicate that the director has isolated a phrase or expression from one or the other and disregarded all other evidence. Dr. Terman considered petitioner's work history, the fact that his difficulties had persisted since junior high school when he had first received psychiatric treatment, the petitioner's admission that treatment overcame his then suicidal tendencies, his admission that "he feels able to work but can't think of a job I'd want," his prison record, and other criminal charges, his admission of feigning illness in jail. Although the doctor recognized that the petitioner had an antisocial personality (sociopathic personality disorder) and the prognosis for improvement was poor, he found no evidence of thought disorder or other symptoms of psychosis, significant depression, or disturbance of orientation or memory. The foregoing supported his conclusion, set forth in the decision, "I see no clear evidence of a psychotic disorder which would prevent competitive employment."

Dr. Katz, as outlined above, tested the petitioner and his conclusions set forth above, and incorporated in the decision were supported by the results of those tests. Petitioner suggests that his findings should not be considered because the regulations provide that only a board eligible or board certified psychiatrist are considered competent to verify medical findings of a major mental impairment. (See MPP, § 41-313, California,

SDSW Manual, EAS, Issue 939, effective 10/1/71.)[11] The regulations, however, provide as noted below for psychological testing to determine the applicant's potential for employment. *(Id.* § 41-315.)[12]

In addition to the admission to Dr. Terman that he felt able to work, the petitioner testified at the hearing that he would like to work as a taxi driver or a furniture repairer, and that his leg was the reason for his disability.

■ The foregoing evidence fully sustains the findings of the referee, the director, and the judgment of the trial court denying relief.

The thrust of the petitioner's argument is that the director should have adopted the report of Dr. Gabby, who concluded, ". . . he is suffering from a Chronic Schizophrenic Reaction . . . Prognosis remains extremely guarded unless he can get some long-term help, and I am not sure he can sit still long enough to get the help he needs. Thus the prognosis remains guarded." Petitioner points out that there are facts in the records of petitioner's treatment for his broken leg, in the reports of Dr. Terman, and Dr. Katz, and in a further report from Dr. Quint, a resident psychiatrist from the hospital, who concluded the petitioner suffered from a personality disorder, which are consistent with Dr. Gabby's conclusion. The fact remains that Dr. Gabby was the only one who furnished medical verification that the applicant had a major mental impairment. Neither the referee nor the director was obligated to accept

---

[11]Regulation 41-313 reads in pertinent part:

"41-313.2 *Psychiatric Report* [¶] When the eligibility worker believes that applicant has a psychiatric impairment or applicant's history with the agency indicates the existence of a mental or emotional problem, he shall arrange for the applicant to have a psychiatric evaluation. The eligibility worker shall include in the referral letter to the psychiatrist a brief summary of the applicant's problem and provide him with appropriate information such as a social assessment if one has been made or a summary of previous contacts. This summary is to inform the psychiatrist of the reasons why the applicant is considered mentally or emotionally disturbed. This information shall be sent in advance of the appointment. The social summary may be in narrative style or Form DM 2 may be used."

The reference to a specialist who is board certified or eligible for board examinations is found in regulation 41-313.111 which permits waiver of the requirement that a psychiatric report be made on a prescribed form when the examination is done by one so qualified.

[12]Regulation 41-315 reads in pertinent part:

"41-315.3 *Psychological Reports for Purposes Other Than Mental Retardation* [¶] A psychological report given for the purpose of helping to evaluate brain damage, personality disorders or psychosis shall include the tests given, a breakdown by subtests, a performance and verbal IQ, the psychologist's interpretation of findings, his impression of the individual tested and the individual's potentials for employment or home-making. . . ."

that diagnosis in the face of evidence to the contrary. The fact that the trial court or this court might have granted greater weight to Dr. Gabby's diagnosis is not material within the principles first set forth in this part and the facts found in the record which support the director's decision.

This case bears tragic witness to the fact that society has failed to deal with the problem of the antisocial personality. The revolving door of our system of administration of criminal justice, which is kept in motion by those suffering from sociopathic personality disorders, cries out for some panacea to relieve it of the burdens imposed by excessive crime. Such relief, however, is not to be found in extending a system of relief for those with medically verified permanent disability from physical and mental impairments to a class not contemplated by law.

It is concluded that the director's revised decision was in accordance with law and was sustained by substantial evidence.

The judgment is affirmed.

Molinari, P. J., and Elkington, J., concurred.